## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JENNIFER SHEELER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO. 08-64J** |
| | ) |
| **MICHAEL J. ASTRUE,** | )    **JUDGE KIM R. GIBSON** |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I. SYNOPSIS

This matter comes before the Court on the parties' cross-motions for summary judgment.

Doc. Nos. 10 & 14. The Court has jurisdiction in this case pursuant to 42 U.S.C. § 1383(c)(3),

which incorporates the standards applicable under 42 U.S.C. § 405(g). For the reasons that follow,

the Court will deny the Motion for Summary Judgment filed by the Plaintiff (Doc. No. 10), grant the

Motion for Summary Judgment filed by the Commissioner of Social Security ("Commissioner")

(Doc. No. 14), and affirm the administrative decision made by the Commissioner in this case.

### II. PROCEDURAL HISTORY

Plaintiff Jennifer Sheeler ("Sheeler") protectively filed an application for supplemental

security income ("SSI") benefits under Title XVI of the Social Security Act ("Act") on April 28,

2005, alleging disability as of February 26, 2003. R. p. 68. The application was denied by the state

agency on August 1, 2005. R. p. 30. On August 9, 2005, Sheeler filed a timely request for an

administrative hearing. R. p. 35. Sheeler appeared before Administrative Law Judge John J.

Mulrooney ("ALJ") on August 29, 2006, without legal counsel. R. pp. 340-348. The ALJ postponed

the hearing so that Sheeler would have an opportunity to obtain proper counsel. *Id.* The rescheduled hearing was held before the ALJ in Johnstown, Pennsylvania, on January 4, 2007. R. p. 349. Sheeler, who was represented by counsel, appeared and testified at the hearing. R. pp. 351-379. Testimony was also taken from John Golloway ("Golloway"), Sheeler's live-in boyfriend, and Mark Heckman ("Heckman"), an impartial vocational expert. R. pp. 379-394. In a decision dated March 12, 2007, the ALJ determined that Sheeler was not "disabled" within the meaning of the Act. R. pp. 11-22. The Appeals Council denied Sheeler's request for review on January 11, 2008, thereby making the ALJ's decision the final decision of the Commissioner in this case. R. p. 4.

On March 11, 2008, Sheeler commenced this action against the Commissioner, seeking review of the ALJ's decision denying her application for SSI benefits. Doc. No. 1. Sheeler and the Commissioner filed cross-motions for summary judgment on August 15, 2008, and October 15, 2008, respectively. Doc. Nos. 10 & 14. These motions are the subject of this Memorandum Opinion.

## III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

2

*Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988) (internal quotation marks omitted). Where the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec. of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec. of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States

3

Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to

4

be a more adequate or proper basis. To do so would propel the court
into the domain which Congress has set aside exclusively for the
administrative agency.

The Third Circuit has recognized the applicability of this rule in the Social Security disability

context. *Fargnoli v. Massanari*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001). Thus, the Court's review is

limited to the four corners of the ALJ's decision.

## IV. DISCUSSION

In his decision, the ALJ determined that Sheeler had not engaged in substantial gainful

activity since her alleged onset date. R. p. 16. Sheeler was found to be suffering from borderline

intellectual functioning, a learning disability, a generalized anxiety disorder, a dysthymic disorder,

a history of bilateral subluxing patella, obesity, cervalgia migraine headaches, and glaucoma. R. p.

16. Sheeler's glaucoma was found to be "non-severe," but the remaining impairments were found

to be "severe" for purposes of 20 C.F.R. §§ 416.920(a)(4)(ii) and 416.920(c). *Id.* The ALJ

concluded that these impairments did not meet or medically equal an impairment listed in 20 C.F.R.

Pt. 404, Subpt. P, App. 1 ("Listing of Impairments"). R. pp. 16-17. In accordance with 20 C.F.R.

§ 416.945, the ALJ assessed Sheeler's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds
> that the claimant has the residual functional capacity to perform
> sedentary work activity. Further, she is limited to occasional postural
> maneuvers such as balancing, stooping and climbing ramps and stairs,
> must avoid kneeling, crouching, crawling and climbing ladders, ropes
> and scaffolds, must be afforded the option to sit and stand for one to
> two minutes every hour or so during the work day, is limited to
> occasional pushing and pulling with the lower extremities to include
> the operation of pedals, must avoid frequent video monitoring work,
> is limited to simple, routine, repetitive tasks, not performed in a fast-
> paced production environment, involving only simple, work-related

5

> decisions and, in general, relatively few work place changes with no more than occasional interaction with co-workers, supervisors and the general public and is limited to occupations which require no prolonged reading for content and comprehension or mathematical calculations such as cashier or teller work.

R. p. 17. Sheeler was born on August 1, 1982, making her twenty-four years of age on the date of the ALJ's decision and twenty-six years of age at the present time. R. p. 21. This made her a "younger person" under 20 C.F.R. § 416.963(c). She had both a high school education and an ability to communicate in English. *Id.* She had no past relevant work.[1] *Id.* Given the applicable residual functional capacity and vocational assessments, the ALJ determined that Sheeler could work as a product inspector, an ampoule sealer, or a charge account clerk. *Id.* Heckman's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 1382c(a)(3)(B). R. pp. 388-394. Consequently, the ALJ found that Sheeler was not disabled under 42 U.S.C. § 1382c(a)(3)(A). R. p. 22.

Sheeler contends that the ALJ failed to consider all of her impairments, both severe and non-severe, in determining her residual functional capacity. Doc. No. 11, pp. 21-22. She argues that the ALJ failed to account for her glaucoma, which was found to be non-severe. Doc. No. 11, pp. 19-20. As an initial matter, it is unclear whether Sheeler attempts to challenge the severity determination itself (i.e., the ALJ's conclusion that Sheeler's glaucoma was a non-severe impairment), or whether she is simply contending that this impairment, regardless of its severity. was wrongfully ignored by the ALJ. For this reason, the Court will address both possible arguments.

---

[1]The regulation defining the term "past relevant work" provides: "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 416.960(b)(1).

The second step of the sequential evaluation process has been described by the United States Court of Appeals for the Third Circuit as "a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 549 (3d Cir. 2003). To surmount this hurdle, a claimant need only demonstrate the existence of something more than a "slight abnormality" (or a combination of slight abnormalities) which has no more than a minimal impact on his or her ability to work. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). The purpose of the second step of the process is to quickly dispose of any claim in which a claimant fails to make a "reasonable threshold showing" that his or her impairment is "one which could conceivably keep him or her from working." *McDonald v. Sec. of Health & Human Servs.*, 795 F.2d 1118, 1122 (1st Cir. 1986).

In this case, the ALJ determined that Sheeler was not disabled at the fifth step of the process. R. pp. 21-22. The Court acknowledges that "because step two is to be rarely used as a basis for the denial of benefits, its invocation [for that purpose] is certain to raise a judicial eyebrow." *McCrea*, 370 F.3d at 361 (internal citations omitted). Accordingly, where the ALJ does not utilize the second step as a basis for the denial of benefits, a rigorous examination of the severity determination is not necessary. *Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."). In this case, Sheeler's claim was not denied at the second step of the process, since she had other impairments that were found to be severe. Therefore, any error that may have been committed by the ALJ in determining that Sheeler's glaucoma was a non-severe

7

impairment was not dispositive.[2]

Of course, the ALJ was required to consider Sheeler's glaucoma (and any resulting limitations) in determining her residual functional capacity. 20 C.F.R. § 416.945(a)(2). Sheeler argues that the ALJ failed to properly account for her glaucoma. Doc. No. 11, pp. 19-20. This argument is without merit. In both his hypothetical question to Heckman and his ultimate assessment of Sheeler's residual functional capacity, the ALJ indicated that Sheeler could not engage in "frequent video monitoring work." R. pp. 17, 389-90. It is inconceivable that this limitation could have been included to account for an impairment other than Sheeler's visual impairment.[3] This clearly expressed limitation provides substantial evidence that the ALJ did not ignore or overlook Sheeler's glaucoma.[4]

Sheeler evidently believes that her glaucoma causes a greater degree of visual limitation than that acknowledged by the ALJ. Nevertheless, the record contains evidence to support the ALJ's findings. On March 15, 2004, Sheeler visited Dr. Peggy Dixon, who was apparently affiliated with

[2]The Court expresses no opinion as to whether Sheeler's claim could have been properly denied at the second step of the sequential evaluation process if her glaucoma had been her sole impairment. Harmless error analysis is sometimes proper in the Social Security disability context. *Hummel v. Heckler*, 736 F.2d 91, 95 (3d Cir. 1984)("We could apply a harmless error analysis with respect to a claim that the adjudicator may have been biased only if the record contained no evidence whatsoever which might support a finding of disability."). Since the ALJ himself determined that Sheeler's other impairments were severe (thereby permitting Sheeler's claim to progress through the remaining steps of the process), the Court can conclude that any error in the ALJ's severity determination with respect to Sheeler's glaucoma was of no dispositive significance. In making this observation, the Court relies on the ALJ's own findings with respect to Sheeler's other impairments, and does not substitute its own reasoning for that of the ALJ. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).

[3]The ALJ also determined that Sheeler was precluded from engaging in "prolonged reading for content or comprehension," but that limitation may have been designed to accommodate Sheeler's learning disability. R. p. 17.

[4]In his hypothetical question to Heckman, the ALJ indicated that Sheeler could engage in "occasional video monitor work," but that she could not engage in "frequent video monitor work." R. pp. 389-390. Because the ALJ was so careful to clarify the scope of this limitation, the Court is convinced that he framed his hypothetical question with Sheeler's glaucoma (and any resulting limitations) in mind.

8

the Eye Care Center at Progressive Vision Institute. R. p. 227. Three days after the visit, Dr. Dixon reported that Sheeler had been reading, using her computer, and watching television, and that she had voiced no complaints about her vision. *Id.* No eye-related treatment was recommended for Sheeler at that time. On October 7, 2004, Dr. Jing Cheng Zhao reported that he had examined Sheeler's eyes, and that her "visual acuity" had been "20/20 OU with correction." R. p. 264. Sheeler continued to seek treatment from Dr. Zhao. In a letter to Dr. Michael Sinitsa dated June 9, 2005, Dr. Zhao made the following observations about Sheeler:

> I saw her today. Her visual acuity was 20/20 OU with correction.
> Applanation tonometry measured 12mm/Hg OD and 20 mm/Hg OS.
> She was instructed to use Lumigan OU q.h.s.
>
> She is also complaining of blurred vision, OS greater than OD, for a
> few seconds, which improved by blinking. I have asked her to use
> Artificial Tears OU q.i.d./p.r.n. I will see her in three months to
> obtain a visual field and a dilated fundus exam.

R. p. 302. The ALJ expressly relied on this evidence in determining that Sheeler's glaucoma was not severe. R. p. 16.

At the hearing, Sheeler testified that her vision would get blurry after about twenty minutes of reading or watching television. R. p. 357. When her attorney asked her how long it would take her to retrieve her normal quality of vision in such a situation, Sheeler replied, "Twenty minutes." R. pp. 366-367. She stated that her eyesight had deteriorated to that point by March 2005. R. p. 367. The timeframe identified in Sheeler's testimony predated Dr. Zhao's letter to Dr. Sinitsa by approximately three months. There is an obvious difference between the "few seconds" referenced in Dr. Zhao's letter and the "twenty minutes" referenced in Sheeler's testimony. Given the

9

countervailing evidence contained in Dr. Zhao's letter, it was not unreasonable for the ALJ to conclude that Sheeler's testimony was not fully credible. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985).

Sheeler argues that the ALJ failed to incorporate all of her impairments into his hypothetical question to Heckman. Doc. No. 11, p. 24. She apparently believes that her visual impairment would preclude her from working as a product inspector, an ampoule sealer, or a charge account clerk. At the hearing, in response to questions posed by Sheeler's attorney, Heckman described the visual requirements for each type of job. According to Heckman, a product inspector checks products for defects, an ampoule sealer puts lids on test tubes, and a charge account clerk reads charge slips. R. pp. 391-393. A blind person could not perform such duties. However, the ALJ made clear in his opinion that he did not believe Sheeler to be limited to the degree implied in the attorney's questions to Heckman. R. p. 22. The ALJ's determination that Sheeler's glaucoma did not preclude her from working as a product inspector, an ampoule sealer or a charge account clerk was based on competent medical evidence provided by treating sources. Because the additional visual limitations alleged by Sheeler were not credibly established in the record, the ALJ did not have to account for them in his residual functional capacity assessment (or in his hypothetical question to Heckman based on that assessment). *Rutherford v. Barnhart*, 399 F.3d 546, 553-556 (3d Cir. 2005).

At the hearing, Sheeler described the severity of her migraine headaches. In response to questions posed by her attorney, she testified as follows:

> Q.   Okay. Now, you have another problem that you take a
>       medication called Imitrex for isn't it?

10

A.   Yes, it's for my migraines.

Q.   Okay, and migraines have been a part of your life for how long?

A.   Sixteen maybe. I've had them for quite a while.

Q.   And how often do you get migraines now?

A.   I get them six days a week--

Q.   Okay.

A.   And they last for two to ten hours at a time.

Q.   Okay, now your migraines at that level of intensity and that frequency that you've just described, as we look back in time, how long have they been at that frequency?

A.   What do you mean exactly?

Q.   How long have you been getting them six days a week?

A.   The last, about the last three years.

Q.   Okay, and you've been getting them six days a week for that period of time?

A.   Yes.

Q.   And the frequency or the length you said was two to ten hours?

A.   Uh-huh.

Q.   Has it been like that for the last three years or so also?

A.   Yes.

Q.   Is there anything that seems to affect the length of the migraines, because it's a large area of time?

11

A.      Not that I really know of.  I just, they come on and I just get them.

Q.      Do you get any warning that they're coming on they just appear?

A.      They just hit me.

Q.      Okay.  What do you have to do when you get a migraine?

A.      Well, when I get a migraine I take Imitrex.  It helps a little but not much.

Q.      Okay.

A.      I lay in bed.  I have John, he covers over the--

Q.      Mr. Golloway?

A.      Yes.

Q.      Okay.

A.      I have him cover over the windows to keep the light out and I turn the TV off and I just have total silence in the room.

Q.      Okay, are you able to sleep at all when you're having these migraines?

A.      No, I'm not.

Q.      When the migraine is over what do you do?

A.      When the migraine is over, I finally can rest, relax, and then I finally fall asleep.

Q.      Those six days when you're having migraines, what is your sleep pattern like for a 24-hour period?

A.      You want to know my whole day or--

12

Q.      Uh-huh.

A.      Just how many hours I get?

Q.      The whole day, the whole 24-hour period.

A.      Well, I get up at 10:00.

Q.      No, your 24-hour period as far as how much sleep you get?

A.      I get about 15 to 20 hours of sleep.

R. pp. 373-375. Sheeler argues that the ALJ failed to properly discuss the effects that her migraine headaches had on her ability to work. Doc. No. 11, p. 20.

In *Mason v. Shalala*, the Third Circuit explained that where medical evidence supports a claimant's subjective complaints, such complaints cannot be disregarded unless the record contains contrary medical evidence. 994 F.2d 1058, 1067-1068 (3d Cir. 1993). The record contains documentary evidence of Sheeler's migraine headaches. On November 24, 2006, Sheeler visited Dr. John M. Vasil, complaining of migraine headaches. R. p. 315. Imitrex was prescribed for her. *Id.* When she returned to Dr. Vasil's office on January 8, 2007, she indicated that her migraine headaches had persisted. R. p. 314. Hence, the existence of Sheeler's migraine headaches is firmly established in the record, and the ALJ appropriately determined that this impairment was severe. R. p. 16.

In this context, however, it is not enough for a claimant to establish the existence of an impairment. What matters is whether an impairment so reduces the claimant's residual functional capacity that he or she is precluded from engaging in substantial gainful activity. "Residual

13

functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments." *Pearson v. Barnhart*, 380 F. Supp. 2d 496, 505 (D.N.J. 2005). Impairments which do not translate into functional limitations are of no significance.

Sheeler's testimony, if fully credited, would most likely establish the existence of a statutory disability. Nevertheless, the record contains affirmative evidence that Sheeler's migraine headaches did not preclude her from engaging in substantial gainful activity. Dr. Leon Venier examined Sheeler on August 16, 2004. R. p. 253. On that occasion, Sheeler specifically revealed that she had been experiencing migraine headaches. R. p. 247. Dr. Venier completed a medical source statement indicating that Sheeler could frequently lift or carry two to three pounds and occasionally lift or carry up to twenty pounds. R. p. 251. He further opined that Sheeler's pushing and pulling abilities were unlimited. *Id.* Although he reported that Sheeler could only stand or walk for up to one hour (or less) throughout the course of an eight-hour workday, he indicated that she could sit for a full eight hours with a sit/stand option. *Id.* Since Sheeler's migraine headaches were known to Dr. Venier, the capacities identified in the medical source statement evidently accounted for that impairment (and any resulting limitations).

The ALJ determined that Sheeler could engage in a range of sedentary work. R. p. 17. The applicable regulation, 20 C.F.R. § 416.967(a), provides:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

14

20 C.F.R. § 416.967(a). With respect to the lifting and carrying requirements, Dr. Venier's assessment of Sheeler's abilities was consistent with a determination that she could engage in sedentary work, since he reported that she could occasionally lift or carry up to twenty pounds. R. p. 251. However, the medical source statement defines the word "occasional" as "from very little up to 1/3 of an 8 hour day." *Id.* Dr. Venier did not believe Sheeler to be capable of standing or walking for up to one-third of a workday, so his assessment could be understood to mean that Sheeler could not engage in the full range of sedentary work, which requires "occasional" standing and walking. Nonetheless, the record makes it clear that the jobs identified in Heckman's testimony would not require Sheeler to stand or walk for more than two minutes per hour, or sixteen minutes in an eight-hour workday. R. pp. 393-394. Heckman clarified that when questioned by Sheeler's attorney. *Id.* Because the precise degree of limitation experienced by Sheeler was conveyed to (and understood by) Heckman, his testimony constituted substantial evidence of the existence of jobs in the national economy which were consistent with Sheeler's residual functional capacity. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). The residual functional capacity assessment was itself supported by the record, since Dr. Venier (who knew about Sheeler's migraine headaches) believed Sheeler to be capable of standing or walking for up to one hour, and sitting for up to eight hours, during the course of an eight-hour workday. R. p. 251. The ALJ specifically referenced Dr. Venier's examination report in his opinion. R. p. 19. Accordingly, the Court is convinced that the record contained sufficient medical evidence of Sheeler's functional capacities to enable the ALJ to reject Sheeler's testimony "concerning the intensity, persistence and limiting effects" of her migraine

15

headaches.[5] *Id.*

The Court acknowledges that the ALJ's treatment of Sheeler's migraine headaches was not exhaustive. However, all that was required was a "minimal" articulation of his analysis sufficient for a reviewing court to trace the path of his reasoning. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). In many cases, a sentence or short paragraph can satisfy this standard. *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). The ALJ's discussion about Sheeler's migraine headaches is no doubt abbreviated, but it nevertheless suffices to enable the Court to follow his line of reasoning. As noted earlier, the focus of the inquiry is on the limitations caused by impairments, rather than the impairments themselves.

Sheeler argues that the ALJ failed to assess her work-related abilities on a function-by-function basis. Doc. No. 11, p. 22. It is difficult to understand how she can advance this argument, given the extremely detailed nature of the ALJ's residual functional capacity assessment. In his hypothetical question to Heckman, the ALJ was very careful to describe Sheeler's specific functional limitations with precision. R. pp. 389-390. The assessment incorporated several exertional and nonexertional limitations. R. p. 17. In light of such meticulous specificity, the Court cannot accept Sheeler's argument that the ALJ's evaluation of her limitations was somehow too generalized to withstand judicial scrutiny.

_____

[5]Golloway testified that he had stopped his vehicle four or five times while transporting Sheeler to the hearing so that she could get some circulation in her legs. R. p. 381. The ALJ partially credited Golloway's testimony by incorporating an hourly, two-minute-long sit/stand option into his assessment of Sheeler's residual functional capacity. R. p. 17. The ALJ observed that, during the hour-long hearing, Sheeler had only needed to stretch for a few minutes. R. p. 20. Because this matter involved "readily observable, everyday behaviors" rather than sophisticated medical evidence, the ALJ's reliance on his own observations of Sheeler's demeanor at the hearing was permissible. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007).

16

Where a claimant has both exertional and nonexertional limitations, there is a particularly acute need for a comprehensive residual functional capacity assessment. *Burnam v. Schweiker*, 682 F.2d 456, 458 (3d Cir. 1982)("The fact that work exists in the national economy for a person who *only* has Burnam's exertional impairments, or for a person who *only* has his nonexertional impairments, does not mean that work exists in the national economy for a person who suffers from *both* types of impairments simultaneously.")(emphasis in original). The ALJ was evidently mindful of this when he assessed Sheeler's residual functional capacity. He accommodated her exertional impairments by limiting her to sedentary work involving only occasional balancing, stooping, climbing, kneeling, crouching, and crawling. R. p. 17. He accounted for her visual impairment by precluding frequent video monitoring work. *Id.* He acknowledged her learning disability by limiting her to work requiring no prolonged reading for content and comprehension or mathematical calculations. *Id.* Finally, he accommodated her mental impairments by stating that she was limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related decisions, relatively few workplace changes, and only occasional interaction with co-workers, supervisors, or members of the general public. *Id.* Sheeler does not appear to argue that the ALJ failed to incorporate a specific nonexertional limitation established by the record. Instead, she argues that the ALJ should have credited the report of Dr. John A. Mills, who gave her a Global Assessment of Functional ("GAF") score of 50 after an examination conducted on July 6, 2006. Doc. No. 11, pp. 20, 23.

The GAF scale appears in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition ("DSM-IV"). A score of between 41 and 50 indicates

the following:

> **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

DSM-IV at 34 (boldface type in original). The DSM-IV's use of the word "or" indicates that the enumerated list of characteristics is disjunctive. *Gulf Fisherman's Association v. Gutierrez*, 529 F.3d 1321, 1323-1324 (11th Cir. 2008). Consequently, an individual with a GAF score of 50 is not *ipso facto* "unable to keep a job." "Clinicians use a GAF scale to identify an individual's overall level of functioning, and a lower score may indicate problems that do not necessarily relate to the ability to hold a job." *Ramos v. Barnhart*, 513 F.Supp.2d 249, 261 (E.D.Pa. 2007)(internal quotation marks omitted).

While Sheeler focuses on the her GAF score of 50, the ALJ's residual functional capacity assessment is consistent with the more detailed assessment completed by Dr. Mills concerning her ability to engage in work-related activities. The only "marked" restrictions that Dr. Mills found Sheeler to have were in her abilities to carry out detailed instructions and to respond appropriately to work pressures in a usual work setting. R. p. 300. In notations describing the rationale for his assessment, Dr. Mills stated that Sheeler was "easily overwhelmed," that she had "limited intellectual ability," and that she could not make any "sophisticated judgments." *Id.* These specific findings regarding Sheeler's functional capacities are far more relevant to the Court's inquiry than is a generalized GAF score. The specific nonexertional limitations found by Dr. Mills were accounted for in the ALJ's residual functional capacity assessment, and Sheeler's low GAF score

18

has no significance outside of the context of specific work-related limitations. Heckman's testimony established that a product inspector, an ampoule sealer or a charge account clerk would not be expected to carry out detailed instructions or perform tasks in a fast-paced production environment. R. pp. 389-390. Because the residual functional capacity assessment accounts for the marked limitations found by Dr. Mills, the ALJ's determination is supported by substantial evidence.

On August 28, 2007, more than five months after the issuance of the ALJ's opinion, Dr. Frank K. Schmidt performed a psychological examination of Sheeler. R. pp. 332-339. He found her unable "to even minimally tolerate stressors in the work environment." R. p. 338. He further reported that, if Sheeler were to secure employment, work-related stress would "severely exacerbate her symptoms of pain and adversely affect her other psychological illnesses." *Id.* The ALJ's opinion obviously did not account for this subsequent examination report. Although Dr. Schmidt's report was presented to the Appeals Council, review of the ALJ's decision was not granted. R. pp. 3-4. Because the ALJ's decision became the final decision of the Commissioner, it is *that* decision which is currently under review. Under Third Circuit precedent, this Court cannot consider Dr. Schmidt's report at this stage.[6] *Matthews v. Apfel*, 239 F.3d 589, 591-596 (3d Cir. 2001). Sheeler advances

---

[6]Compare *Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262-1267 (11th Cir. 2007), *Higginbotham v. Barnhart*, 405 F. 3d 332, 336-337 (5th Cir. 2005), *Perez v. Chater*, 77 F. 3d 41, 45 (2d Cir. 1996), *O'Dell v. Shalala*, 44 F. 3d 855, 859 (10th Cir. 1994), *Ramirez v. Shalala*, 8 F. 3d 1449, 1452 (9th Cir. 1993), *Nelson v. Sullivan*, 966 F. 2d 363, 366 (8th Cir. 1992), and *Wilkins v. Secretary of DHHS*, 953 F. 2d 93, 96 (4th Cir. 1991) (en banc), (holding that evidence not submitted to the ALJ but later submitted to the Appeals Council, which later denies review, should be considered by the District Court), with *Matthews v. Apfel*, 239 F. 3d 589, 593-594 (3d Cir. 2001), *Cotton v. Sullivan*, 2 F. 3d 692, 695-696 (6th Cir. 1993), and *Eads v. Secretary of DHHS*, 983 F. 2d 815, 817-818 (7th Cir. 1993), (holding that evidence not presented to the ALJ but later submitted to the Appeals Council, which later denies review, should not be considered by the District Court unless the claimant shows good cause for not having submitted the evidence to the ALJ). See also *Mills v. Apfel*, 244 F. 3d 1, 4-6 (1st Cir. 2001), (holding that an ALJ cannot be faulted for failing to consider unavailable evidence, but that "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for its action.").

19

no argument as to whether she had good cause for not securing this evidence (and presenting it to the ALJ) before the issuance of the ALJ's decision. Therefore, the Court must affirm the decision of the Commissioner in this case. If Sheeler believes that Dr. Schmidt's examination report can establish that she is disabled, she should present it to the Commissioner in connection with any future SSI applications. The ALJ's conclusion that Sheeler was not disabled as of March 12, 2007, is "supported by substantial evidence" within the meaning of § 405(g).

## V. CONCLUSION

The ALJ's comprehensive assessment of Sheeler's residual functional capacity is supported by the evidence contained in the administrative record. Because the Commissioner's findings of fact are "supported by substantial evidence," the Court must treat them as conclusive. 42 U.S.C. § 405(g). Accordingly, the Court will deny the Motion for Summary Judgment filed by Sheeler (Document No. 10), grant the Motion for Summary Judgment filed by the Commissioner (Document No. 14), and affirm the administrative decision made by the Commissioner in this case. An appropriate order follows.

**AND NOW**, this 24thday of March, 2009, this matter coming before the Court on the Motion

for Summary Judgment filed by the Plaintiff (Doc. No. 10) and the Motion for Summary Judgment

filed by the Defendant (Doc. No. 14), IT IS HEREBY ORDERED that the Plaintiff's Motion for

Summary Judgment is **DENIED**, that the Defendant's Motion for Summary Judgment is

**GRANTED**, and that the decision of the Commissioner of Social Security is **AFFIRMED**.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**